RAYMOND P. WORTENDYKE, trustee, &c.,

*v.*

LOUIS RAYOT et al.

[Submitted April 3d, 1916. Decided May 4th, 1916.]

1. A joinder by a wife in a conveyance by a solvent husband releasing her dower, is sufficient consideration for a reconveyance to the husband and wife jointly of a part of the same land.

2. A reference to a master is necessary to determine the respective contributions of the husband and wife to the improvements on the land.

3. The evidence of the defendants as to the disposition of the consideration for the conveyance *held* so improbable as to be unworthy of belief.

---

On bill and answer.

*Mr. Higgins* and *Mr. Merritt Lane,* for the complainant.

*Messrs. Peter & John Bentley,* for the defendants.

GRIFFIN, V. C.

The bill in this cause is filed by the complainant, as trustee in bankruptcy, to set aside conveyances alleged to have been made by Louis Rayot, the bankrupt, in fraud of creditors. It

appears from the bill, and is admitted by his answer, that about the 18th of August, 1907, Louise Gousset, the mother of the defendant Louis, the bankrupt, died, leaving her last will and testament, which was duly admitted to probate, in and by which she devised all the property, with the buildings thereon erected, known as two and forty-nine one hundredths acres, situate in the borough of Fairview, Bergen county, New Jersey, to her four children, Mrs. Lucy Grod, Mrs. Zeline Baker, Louis Rayot (the bankrupt) and Aimee Gousset, as tenants in common, in fee; that on or about the 24th day of June, 1910, said devisees conveyed said lands to Barney Hermes, single, who then reconveyed to said devisees certain portions of said two and forty-nine one hundredths acres as had been agreed upon by them among themselves, in pursuance of an agreement to that effect before made among them, for the purpose of vesting parts of the land devised by said Louise Gousset to her children, so that each would own in fee-simple a certain part in his or her own right; that said Barney Hermes, accordingly, by deed dated the 22d of June, 1910, and recorded the 24th of June, 1910, conveyed a portion of said land, less than one and forty-nine one hundredths acres (the description being "for a tract of one and forty-nine one hundredths acres, excepting therefrom a portion thereof thereinafter described") to Louis Rayot and wife. And it is alleged that said conveyances were voluntary, and were made by virtue of an agreement made between the said Hermes and said devisees whereby a certain portion of the property devised by the said Louise Gousset would be owned in fee by Louis Rayot in his own right; that afterwards, on the 26th day of May, 1913, Louis Rayot and his wife conveyed to Barney Hermes the lands and premises theretofore conveyed by Hermes to them.

Paragraph 8 of the amended bill alleges that while the said Louis and his wife were the owners, and prior to the conveyance to Hermes of May, 1913, Louis Rayot erected on the premises five two-family houses, upon which he executed five mortgages in the sum of $600 each. This paragraph is substantially admitted by Louis Rayot, excepting this, that he denies that all the moneys therefor were furnished by him. The answer of Mrs. Rayot to this paragraph is an admission that the "said de-

fendant physically erected the buildings on the premises; that there is a mortgage of $600 on each house, but denies that said Louis Rayot erected them out of his own money or property." The answer of Hermes practically pleads ignorance of all the facts set out in the bill excepting that he denies that the conveyance of May, 1913, to him was voluntary, but that, on the contrary, he paid a valuable consideration therefor.

No evidence in the cause was taken on the question of who advanced the funds to erect these buildings.

The prayer of the bill is that it may be adjudged and decreed that the lands conveyed by Hermes to Rayot and wife belong to Louis Rayot, bankrupt, and that the conveyance mentioned in paragraph 7 was voluntary and made with the intent, on the part of the parties thereto, to hinder, delay and defraud the creditors of Louis; and that the land mentioned in paragraph 7 might be decreed to be sold for the payment of the debts due to the creditors of Louis.

The conveyance referred to in the prayer is that made on May 26th, 1913, by Rayot and wife to Hermes.

There is no prayer that the first conveyance, made by Hermes to Rayot and wife on June 22d, 1910 (being the conveyance intended to effect partition), be declared void.

As the question of the validity of the deed of June 22d, 1910, has been argued, I will assume that the bill is broad enough to permit the court to deal with it. The questions arise, was there a valuable consideration to support this conveyance to husband and wife? and was the deed made to hinder, delay and defraud creditors?

The testimony is that prior to the consummation of this voluntary partition, Mrs. Rayot refused to execute a deed unless the lands which were to be received by her husband were placed in their joint names for the protection of herself and her family. This was agreed to; and, accordingly, she joined with her husband and the other devisees in a conveyance of the entire tract of two and forty-nine one hundredths acres to Hermes; and Hermes, in the partition, conveyed the tract containing less than one and forty-nine one hundredths acres to Louis Rayot and his wife; and the deed was promptly recorded. The property,

at that time, was vacant land appraised at $3,000. What the value of the portion of the two and forty-nine one hundredths acres remaining (which apparently had a building erected thereon) was, and how that was disposed of, is not shown by the pleadings or proofs.

At the time that this conveyance was made the defendant Louis Rayot was indebted to Ringger & Company and to Thomas Henry in about $5,200. At the same time he owned a Packard automobile, for which he paid $5,600 the year prior, and sold it in 1911 for $2,500. He had properties on Angelica street, Summit avenue and DuBois street, which he sold after this conveyance, and which netted him $11,850, making the total, including his automobile, upwards of $14,000, being almost three times the amount of his debts, excluding the property in question.

In *Haston* v. *Castner, 31 N. J. Eq. 697 (705)*, Chief-Justice Beasley said: "When the conveyance is not voluntary, but is upon a consideration, then the rule is that in order to overthrow it a fraudulent intent must be made to appear, just as it must be when the debts sought to be enforced have been contracted subsequently to the conveyance." In that case the court said that "the idea that the conveyance was made with a fraudulent intent was utterly exploded by the admitted circumstances." At that time the grantor was not insolvent, but had ample means for the payment of his debts, and was, therefore, under no influence leading him to put the property out of his hands for an illegal purpose. The deeds were drawn by a scrivener of the neighborhood and were recorded. The circumstance that the farms were put to grantor's children at a considerable undervaluation was, under the circumstances, not unnatural, and could not be a fact of much importance in a transaction attended with so many indications of an honest purpose.

In the case now before us the wife released her dower in other property, the value of which has not been shown; and also by executing the deed which resulted in the voluntary partition, she saved for the parties the delay and expense of a proceeding in partition, all of which constituted a valuable consideration; and, as in the *Haston-Castner Case,* the husband had more than ample means to pay all his debts, and the deed was promptly

recorded.    There is nothing in the case which suggests, even by inference, that at the time that this conveyance was made, on June 22d, 1910, Louis Rayot had the slightest thought of having the conveyance made to husband and wife to hinder, delay and defraud his creditors.

My view, therefore, is that the deed of June 22d, 1910, is valid and should stand.

Touching the question of the improvements placed on the premises after the conveyance to Rayot and wife, a reference will be made to a master to ascertain the amounts contributed by each in the erection of the building. *Post* v. *Stiger, 29 N. J. Eq. 554; Mertens* v. *Schlemme, 59 Atl. Rep. 808; Bresniham* v. *Sheehan, 125 Mass. 11.* And all equities will be reserved on this question until the coming in of the master's report.

Next, as to the deed from Rayot and wife to Hermes, dated May 26th, 1913 :  The husband and wife were then seized of the premises in fee.  At the date of the conveyance the husband was indebted to Ringger & Company in about $6,600, and to Henry in about $200, and had no other property.  On May 23d, 1913, Ringger & Company wrote Rayot touching their bill.  On May 26th, 1913, the deed was delivered to Hermes; and on May 27th, 1913, Rayot called on Ringger & Company.  The bill of Rayot to Ringger was discussed, and finally fixed at $6,600, for which Rayot gave Ringger three notes of $2,200 each, payable four months after their date.  Ringger & Company requested that the notes be made for three months, but Rayot wanted the notes made payable at four months, stating that he might dispose of his Fairview property during that time, and he could then pay the notes.  This statement was false and untrue, because at that time he had disposed of the Fairview property. When the notes fell due they were renewed for a further period of four months, Rayot paying $25 on each of two of the notes and $50 on a third with interest.

At the time that these last-mentioned notes were given, he repeated to Ringger & Company his assertion that he had not sold his Fairview property.

On January 27th, 1914, the notes fell due and were not paid.

On March 16th, 1914, Rayot filed his voluntary petition in bankruptcy.

The defendants claim that shortly prior to May 26th, 1913, Rayot and wife made a bargain with Hermes to purchase this property for $12,000 by the payment of $9,600 in cash and the assumption of the payment of mortgages then on the premises for $2,400; that at that time Hermes paid a deposit of $200, for which he took a receipt. This receipt was not produced at the trial, the defendants claiming that it was either lost or destroyed. The title was passed at the office of Mr. Peter Bentley on May 26th, 1913, at which time it is asserted that Hermes paid the balance of the purchase price, $9,400, in cash; that one-half of this sum was received by Mrs. Rayot, and the other half by Mr. Rayot. Mr. Rayot says that he had borrowed $2,000 from his half-brother, Aimee Gousset, and that after paying this sum and sundry bills, he had left about a thousand dollars, which he kept at home, and disbursed the same for household and other expenses. Mrs. Rayot says that she kept her half at home because she did not trust banks. Barney Hermes says that he was a bachelor, and had been for a number of years a painter and decorator, occasionally dabbling in real estate, and that he had accumulated about $15,000, which he kept in his strong box at home. He, likewise, did not trust banks; although he did have a bank account, the balances from time to time being rather small, but in November, 1911, he deposited $600, which was drawn upon in small sums, leaving, however, a balance of upwards of $400 for more than six months.

Mr. Bentley says that at the time of passing title he did not count the money; he saw a large roll of bills lying on the table; he did not see the money paid. He was engaged at the time in dictating an instrument to enable Mr. Rayot, after the sale, to collect the rents as agent for Hermes, as Rayot lived at the premises and Hermes lived in another town; that while preparing this paper he was in and out of the room.

Mrs. Rayot says that in addition to the half which she so received, she also sold to Tiffany & Company diamonds for $700, about a year before she testified, which would be about the spring of 1914. These moneys were mingled with her one-half of the

purchase price. At the trial she produced in court $2,800 in cash, which she said were the same bills which she received on the sale to Hermes and of her diamonds, excepting where she had changed bills of large denominations into smaller.

The complainants, in order to negative the idea that Hermes ever paid this consideration, offered evidence of officials of the treasury department tending to show that a great number of the bills which she produced had not been issued at the time when the consideration of this deed is alleged to have been paid, and also at the time when she sold the diamonds to Tiffany. Among the bills produced were six United States National Bank notes of the denomination of $100 each, one of which was issued February 24th, 1914, and five in August and September, 1914; and four gold and silver certificates, of $100 each, which were issued in October, 1913, January, June and August, 1914, respectively —making, in all, $1,000. There were also seventeen $50 notes which were issued after the date of the transfer to Hermes, making a total of $1,850. Prior to the giving of this testimony, Mrs. Rayot testified that she was in the habit of changing large bills for smaller ones from time to time; but, even assuming this to be true, and the seventeen $50 bills represented bills taken in exchange for $100 bills, and assuming that she was mistaken as to the date when she sold the diamonds to Tiffany, and that the date was after the date of the issue of seven of the $100 bills, nevertheless there were at least three $100 bills that were clearly issued subsequent to the date of the deed to Hermes, and which, at least, must be parcel of the moneys paid by Hermes, if defendants' stories be true. While her testimony was given prior to the introduction of the evidence of the treasury officials, and therefore may not have received from her the attention it deserved, nevertheless, as the testimony up to that time indicated that the bills paid by Hermes were not of larger denominations than $100, it would seem important that she should make some further explanation of this apparent discrepancy; but she was not recalled.

Mr. Hermes, as above stated, said at the time of the conveyance he had about $15,000 in his strong box at home, out of which he took the $9,600, being the consideration paid for his

purchase. This left him about $5,000 in cash. He was also in receipt of $126 a month rent from the property conveyed, which, after paying the disbursements on account of the property, left a balance which he might use at least on account of his living expenses. Yet when he testified he produced about $250, which he said was all the cash he had, the remainder of the $5,000, together with the net income from this property, having been used by him during the two years from the date of the conveyance for his living expenses. There is no evidence in the case that Mr. Hermes was a man of such means as to justify such expenditure. He had little, if any, other property outside of this cash. It also appears that on May 6th, 1911, while he had this $15,000 in his strong box, or a large part thereof, he borrowed $200 from the First National Bank of Guttenberg, giving his mortgage to secure the same, and which sum he paid off in installments of $100 each on March 22d and June 18th, 1912. He explains that he thought he could sell the property better with than without a mortgage covering it. In 1906, he also borrowed $1,200, which he says was done to settle his mother's estate. He testified before the referee in bankruptcy, after which, and before the trial of this cause, he destroyed his bank and check books and stubs, the latter showing for what purpose the money was drawn. The receipt for the alleged deposit of $200 he could not produce; nor was it produced by any of the defendants, they claiming that it was either lost or destroyed.

The defendant Louis Rayot says that in the year 1911 he became ill and began to lose money on his contracts, which, subsequently, resulted in his failure. He was a rather stupid witness, had very little recollection of the source of his receipts and to whom he had paid out moneys drawn from the bank, even where the sums were quite large; he kept no books, and, in testifying, relied solely on such memory as he then had.

On May 22d, 1913, about the time it is alleged he entered into this agreement with Hermes to sell, there appears in the transcript of his account a deposit of $294; and on July 7th of the same year, another deposit of $1,655. He was questioned as to the sources from which he received these payments—whether from contract work or from Hermes as part of the consideration

—but he had no recollection on the subject. From the latter date, until the last deposit made in his account on January 22d, 1914, he deposited about $1,200 more, about $540 of which were notes, which, from their odd amounts, would indicate that they were the notes of his debtors. On January 22d, 1914, appears the last draft on his account, $250, which left a balance of twelve cents.

Touching the $2,000, which he says he paid to Aimee Gousset, he says that this sum was made up of a number of loans made to him from time to time. When such loans were made, and the specific amounts, he was unable to state. Aimee Gousset, who would seem to be a material witness to corroborate him on this question, with the idea of establishing the fact at least that the $2,000 was actually paid to him, was not called as a witness in this cause.

The whole story of the defendants is so highly improbable as to be unworthy of belief.

I will advise a decree that the conveyance made by Rayot and wife to Hermes, dated May 26th, 1913, be set aside as against the complainant, to the extent of the claims of Ringger & Company and Henry.